**JUDGE KOELTL**         **13 CV 6785**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

OTHONIEL HOLGUIN,

                                  Plaintiff,

        -against-

THE CITY OF NEW YORK, DETECTIVE ANGEL DALIZ, DETECTIVE ANDRE MCNULTY, DETECTIVE IVAN RODRIGUEZ, DETECTIVE ALEXANDROS KALOGIROS, AND JOHN/JANE DOE # 1 - 10,

                                  Defendants.
-----------------------------------------------------------------x

COMPLAINT



JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1.     This is an action to recover money damages arising out of the violation of Plaintiff's rights under the Constitution of the United States.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

3.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and 1367(a).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

5.     Plaintiff demands a trial by jury in this action.

## PARTIES

6. Plaintiff Othoniel Holguin ("Plaintiff" or "Mr. Holguin"), an African-American male, is a resident of the County of New York, City of New York.

7. Defendant The City of New York is a municipal organization organized under the laws of the State of New York.

8. Defendant The City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant The City of New York.

9. The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

10. At all times relevant herein, Defendant Detective Angel Daliz ("Daliz") was an officer, employee, and agent of Defendant The City of New York.

11. At all times relevant herein, Defendant Daliz was acting within the scope of his employment with Defendant The City of New York.

12. At all times relevant herein, Defendant Daliz was acting under color of state law.

13. Defendant Daliz is sued in his individual and official capacities.

14. At all times relevant herein, Defendant Detective Andre McNulty ("McNulty") was an officer, employee, and agent of Defendant The City of New York.

15. At all times relevant herein, Defendant McNulty was acting within the scope of his employment with Defendant The City of New York.

16. At all times relevant herein, Defendant McNulty was acting under color of state law.

17. Defendant McNulty is sued in his individual and official capacities.

18. At all times relevant herein, Defendant Detective Ivan Rodriguez ("Rodriguez") was an officer, employee, and agent of Defendant The City of New York.

19. At all times relevant herein, Defendant Rodriguez was acting within the scope of his employment with Defendant The City of New York.

20. At all times relevant herein, Defendant Rodriguez was acting under color of state law.

21. Defendant Rodriguez is sued in his individual and official capacities.

22. At all times relevant herein, Defendant Detective Alexandros Kalogiros ("Kalogiros") was an officer, employee, and agent of Defendant The City of New York.

23. At all times relevant herein, Defendant Kalogiros was acting within the scope of his employment with Defendant The City of New York.

24. At all times relevant herein, Defendant Kalogiros was acting under color of state law.

25. Defendant Kalogiros is sued in his individual and official capacities.

26. At all times relevant herein, Defendants John/Jane Doe # 1 - 10 were supervisors, officers, employees, and/or agents of Defendant The City of New York.

27. At all times relevant herein, Defendants John/Jane Doe # 1 - 10 were acting within the scope of their employment with Defendant The City of New York.

28. At all times relevant herein, Defendants John/Jane Doe # 1 - 10 were acting under color of state law.

29. Defendants John/Jane Doe # 1 - 10 are sued in their individual and official capacities.

30. The names John/Jane Doe # 1 - 10 are fictitious, their true names being unknown to Plaintiff at this time.

## STATEMENT OF FACTS

31. On August 11, 2012, Mr. Holguin was lawfully present at the intersection of Wadsworth Avenue and 180th Street, New York, New York ("Subject Location").

32. Upon arriving at the Subject Location, Mr. Holguin saw an acquaintance, Francisco Garcia.

33. Mr. Holguin and Mr. Garcia spoke for a few minutes before shaking hands and parting ways.

34. As Mr. Holguin attempted to walk across the street, the individual defendants drove up to Mr. Holguin in an unmarked police van and car and got out.

35. The individual defendants immediately forced Mr. Holguin against a nearby gate and searched his person three to four times, removing Mr. Holguins wallet, but finding no contraband.

36. Several minutes later, one of the individual defendants pretended to grab a tissue from the ground and said "Bingo!".

37. Mr. Holguin asked what the officer was holding.

38. The officer said not to worry about it and that he would document it.

39. Mr. Holguin was placed in handcuffs and arrested.

40. Mr. Holguin's arrest was without probable cause.

41. Mr. Holguin's arrest was approved at the Subject Location by Defendant John Doe # 1.

42. Mr. Holguin was transported to a police precinct and placed in a holding cell.

43. At the precinct Mr. Holguin was strip searched by the individual defendants under the direction and approval of Defendant John/Jane Doe # 2.

44. Mr. Holguin had no contraband on his person, and Mr. Holguin had done nothing to give the individual defendants reasonable suspicion or probable cause to conduct the strip search.

45. The individual defendants spoke with the New York County District Attorneys' Office, individually and collectively lying to the New York County District Attorney's Office that Mr. Holguin had violated New York Penal Law §§ 220.03.

46. Based on these fabricated allegations, the New York County District Attorney's Office forwarded to Defendant McNulty a Criminal Court Complaint.

47. The Criminal Court Complaint was reviewed and then signed by Defendant McNulty.

48. When reviewing and signing the Criminal Court Complaint, Defendant McNulty knew the allegations contained therein to be false.

49. The executed Criminal Court Complaint was then forwarded by Defendant McNulty to the New York County District Attorney's Office.

50. Legal process was issued against Mr. Holguin, and Mr. Holguin was subsequently arraigned.

51. During the pendency of the criminal proceeding, the individual defendants forwarded false evidence to the New York County District Attorney's Office, *inter alia*, arrest reports, complaint reports, and property vouchers.

52. The New York County District Attorney's Office forwarded Defendant McNulty's fabricated Criminal Court Complaint to Defendant Kalogiros along with a Supporting Deposition.

53. The Criminal Court Complaint was reviewed by Defendant Kalogiros.

54. When reviewing the Criminal Court Complaint, Defendant Kalogiros knew the allegations contained therein to be false.

55. Despite this knowledge, on September 11, 2012, Defendant Kalogiros signed the Supporting Deposition and forwarded it to the New York County District Attorney's Office.

56. Mr. Holguin suffered damage as a result of Defendants' actions. Mr. Holguin was, *inter alia*, deprived of liberty, suffered emotional distress, mental anguish, fear, anxiety, embarrassment, humiliation, and damage to reputation.

## FIRST CAUSE OF ACTION
*42 U.S.C. § 1983*

57. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

58. Defendants, by their conduct toward Mr. Holguin as alleged herein, violated Mr. Holguin's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

59. As a direct and proximate result of this unlawful conduct, Mr. Holguin sustained the damages herein alleged.

## SECOND CAUSE OF ACTION
*Unlawful Stop and Search*

60. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

61. The individual defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Holguin without reasonable suspicion.

62. As a direct and proximate result of this unlawful conduct, Mr. Holguin sustained the damages herein alleged.

## THIRD CAUSE OF ACTION
*False Arrest*

63. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

64. The individual defendants violated the Fourth and Fourteenth Amendments because they arrested Mr. Holguin without probable cause.

65. As a direct and proximate result of this unlawful conduct, Mr. Holguin sustained the damages herein alleged.

## FOURTH CAUSE OF ACTION
*Denial of Substantive Due Process*

66. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

67. The individual defendants created false evidence against Mr. Holguin.

68. The individual defendants forwarded false evidence to prosecutors in the New York County District Attorney's Office.

69. In creating false evidence against Mr. Holguin, and in forwarding false evidence to prosecutors, the individual defendants violated Mr. Holguin's right to substantive due process under the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution of the United States.

70. As a direct and proximate result of this unlawful conduct, Mr. Holguin sustained the damages herein alleged.

### FIFTH CAUSE OF ACTION
*Malicious Abuse of Process*

71. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

72. The individual defendants issued and/or caused to be issued legal process to place Mr. Holguin under arrest.

73. The individual defendants arrested Mr. Holguin in order to obtain collateral objectives outside the legitimate ends of the legal process, to wit, to cover up their unlawful stop and search of him; to cover up their unlawful stop and frisk tactics; to obtain overtime pay; and to meet quotas set by Defendant The City of New York and the NYPD.

74. The individual defendants pursued these collateral objectives after issuance of legal process by, *inter alia*, forwarding false evidence to the New York County District Attorney's Office and continuing to participate in the prosecution of Mr. Holguin.

75. The individual defendants acted with intent to do harm to Mr. Holguin without excuse or justification.

76. As a direct and proximate result of this unlawful conduct, Mr. Holguin sustained the damages herein alleged.

### SIXTH CAUSE OF ACTION
*Malicious Prosecution*

77. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

78. The individual defendants initiated the criminal proceedings against Mr. Holguin by issuing and/or causing to be issued legal process against Mr. Holguin.

79. The individual defendants lacked probable cause to commence the criminal proceedings against Mr. Holguin.

80. The individual defendants' actions were motivated by actual malice.

81. The criminal proceeding was terminated in Mr. Holguin's favor.

82. As a direct and proximate result of this unlawful conduct, Mr. Holguin sustained the damages herein alleged.

### SEVENTH CAUSE OF ACTION
*Failure to Intervene*

83. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

84. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

85. Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

86. As a direct and proximate result of this unlawful conduct, Mr. Holguin sustained the damages herein alleged.

## EIGHTH CAUSE OF ACTION
### Conspiracy under 42 U.S.C. § 1983

87. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

88. The Defendants and members of the New York County District Attorney's Office jointly participated in the deprivation of Mr. Holguin's constitutional rights as set forth herein.

89. The Defendants conspired in the deprivation of Mr. Holguin's constitutional rights by collectively lying about Mr. Holguin's actions and conduct, and intentionally withholding and/or destroying exculpatory evidence in order to support the Defendants' fabricated version of the events.

90. As a result of the Defendants' malicious efforts to damage Mr. Holguin, Mr. Holguin's liberty was restricted, and Mr. Holguin was restrained, subjected to handcuffing, and, among other things, falsely arrested, strip searched, and prosecuted.

91. As a direct and proximate result of this unlawful conduct, Mr. Holguin sustained the damages herein alleged.

## NINTH CAUSE OF ACTION
### Equal Protection Clause under 42 U.S.C. § 1983

92. Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

93. The Defendants' conduct was tantamount to discrimination against Mr. Holguin based on his ethnicity. This disparate treatment caused Mr. Holguin to suffer serious injuries.

94. The NYPD discriminatory program is pervasive and evident throughout many of its practices, including those used to stop, question, frisk, and arrest Mr. Holguin.

95. The NYPD has maintained illegal stop and question practices, as part of a systematic discriminatory program aimed towards minorities. The searches occur nearly every day without the requisite level of suspicion, and are so customary as to constitute official municipal policy.

96. One such program is the Clean Halls Buildings program, which initially created to combat illegal activity in apartment buildings. Many buildings are enrolled and remain in the program without regard to whether there is sustained or substantial crime. Thus, residents and their unsuspecting guests are left subject to the unscrupulous stop, question, search, citation, and arrest practices of local NYPD officers.

97. The impact on Blacks and Latinos as compared to Whites is disparaging and significant. From 2006 to 2010, approximately 94.4% of those stopped and questioned for trespassing were Black and Latino, although they only accounted for 52% of the New York City population. Blacks and Latinos were 6 times more likely to be stopped by police than Whites, Asians, and Native Americans combined.

98. The NYPD has also maintained illegal stop and frisk policies, as part of a systematic discriminatory program aimed towards minorities.

99. The New York State Attorney General's 1999 inquiry into the NYPD's stop and frisk program found that between the 175,000 "UF-250" stop and frisk forms filed by officers indicated consistent and significant racial skewing.

100. According to the report, Blacks comprised 25.6% of the City's population, yet 50.6% of all persons stopped were Black. Hispanics comprised 23.7% of the City's population yet, 33.0% of all stops were of Hispanics. By contrast, Whites made up 43.4% of the City's population, but accounted for only 12.9% of all stops. The disparities were further pronounced in precincts where the majority of the population was White. Where Blacks and Hispanics each represent less than 10% of the population, Blacks and Hispanics accounted for more than 50% of stops during any given period. The New York State Attorney General's finding was that 8 out of 9 searches did not uncover contraband.

101. Under the NYPD's policy, if a person is stopped and questioned without official use of force (or with consent) and gives his or her name, documentation is not required. Consequently, NYPD officers frequently do not to file the proper UF-250 form to record stop and frisk searches.

102. Many experts believe the numbers available from NYPD offices do not accurately reflect the discrimination of the NYPD's stop and frisk program. In one independent street interview conducted with 100 Black and Hispanic males between the ages of 14 and 35, 81 participants reported having been stopped, patted down and questioned, without being arrested.

103. The NYPD arrests more Blacks, Hispanics, and other minorities as compared to Whites in furtherance of its systematic discriminatory program.

104. The NYPD frequently uses marijuana arrest cases to bolster both its productivity and arrest reports. Marijuana possession is an infraction payable by fine in New York City, yet from 1997 to 2006, 52% Blacks, 31% Hispanics were arrested for possession of marijuana, as compared to 15% of Whites.

105. Despite the overwhelming evidence from U.S. government surveys that have consistently shown young Whites between the ages of 18 and 25 using marijuana at higher rates than either young Hispanics and Blacks, in 2006, the marijuana arrest rate of Blacks was five times that of Whites. The arrest rate of Hispanics in 2006 was nearly three times that of Whites.

106. Arrest records consistently show that where minorities represent a small portion of the population, they also represent the majority of arrestees (with the exception of Staten Island). In Staten Island, Blacks were about 10% of the population, but were 37% of marijuana arrestees. In Manhattan, Blacks were about 17% of the population, but accounted for 43% of marijuana arrestees. In Queens, Blacks were about 20% of the population, but accounted for 57% of marijuana arrestees. In Brooklyn, Blacks were about 36% of the population, but were an overwhelming 65% of marijuana arrestees. Finally, in the Bronx, Blacks were 36% of the population, but accounted for 48% of marijuana arrestees. The White population and the White percentage of marijuana arrestees in each borough were equally skewed, but in the opposite direction.

107. Trespassing and marijuana arrests are the most effective means available for obtaining fingerprints, photographs, and DNA samples (since 2006) from people never before entered in the criminal justice databases. Where those trespassing and marijuana stops result in the issuance of a fine rather than arrest, the outcome is often still detrimental. Often times,

young persons in the housing projects (such as those enrolled in the Clean Halls Buildings program) or other poor neighborhoods do not have the means to pay the fines, and a criminal courts will issue a warrant for their arrest. Many times, the subsequent occasion on which that person is stopped, questioned, frisked, or searched by the NYPD, the outstanding warrant will ultimately serve as a basis for arrest.

108.    In fact, Defendant The City of New York is estopped from asserting that such discrimination and tactics do not occur. In Floyd, et al. v. The City of New York, 08 Civ. 1034 (SAS) (S.D.N.Y. Aug. 12, 2013), the Court found that "[t]he NYPD's practice of making stops that lack individualized suspicion has been so pervasive and persistent as to become not only part of the NYPD's standard operating procedure, but a fact of daily life in some New York City neighborhoods." See Floyd, Docket Entry No. 373 at p. 180.

109.    The Court goes on to find that Defendant The City of New York, in fact, has a policy of indirect racial profiling, and that senior officials of Defendant The City of New York have been deliberately indifferent to the tactics used by NYPD's members. See id. at p. 181.

110.    As a result of the foregoing, Mr. Holguin was deprived of rights under the Equal Protection Clause of the Constitution of the United States, and are thereby entitled to damages.

### TENTH CAUSE OF ACTION
*Monell*

111.    Mr. Holguin repeats and realleges each and every allegation as if fully set forth herein.

112. This is not an isolated incident. Defendant The City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Mr. Holguin.

113. Defendant The City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

114. Defendant The City of New York has stop and frisk tactics and procedures that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

115. As noted, *supra*, Defendant The City of New York is estopped from asserting that these stop and frisk tactics do not exist and that they are unlawful.

116. Defendant The City of New York, through the NYPD, has a *de facto* quota policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

117. This quota policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

118. Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

119. Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

120. Active officers are given promotion opportunities that are not afforded to inactive officers.

121. Active officers are given overtime opportunities, such as security at parades, etc., that are not afforded to inactive officers.

122. The quota policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are not.

123. Defendant The City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully. There are no post-arrest investigations that are performed, and no policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

124. Defendant The City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to proper counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

125. The failure of Defendant The City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

126. Defendant The City of New York is estopped from asserting that a quota/productivity policy does not exist and that this policy motivates police officers to violate the rights of individuals. See Bryant v. The City of New York, 022011/2007 (Kings Cnty. Sup.

Ct.) (jury finding that quota policy exists and that it contributed to constitutional rights violations).

127. Defendant The City of New York, through the NYPD, has a *de facto* overtime policy that encourages and incentivizes unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

128. Defendant The City of New York, through the NYPD, provides officers, including the individual defendants herein, with overtime opportunities when arrest are made, or summonses and desk appearance tickets are issued.

129. Upon making an arrest or issuing summons or desk appearance ticket, an arresting officer submits a request for overtime to his commanding officer.

130. These requests are essentially rubberstamped, with commanding officers performing no investigation into the circumstances of the arrest.

131. Defendant The City of New York, through the NYPD, does not perform any post-arrest investigation and there are no policies in place to prevent abuse of this overtime policy.

132. As a result of this overtime policy, officers, including the individual officers named herein, abuse this overtime policy, making baseless arrests and wrongfully issuing summonses and desk appearance tickets to substantially supplement their income through overtime pay.

133. Defendant The City of New York, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

134. Defendant The City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

135. These policies, practices, and customs were the moving force behind Mr. Holguin's injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Holguin respectfully requests judgment against Defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 23, 2013

_____
Gregory P. Mouton, Jr., Esq.
The Law Office of Gregory P. Mouton, Jr.
Attorney for Plaintiff
305 Broadway, 14th Floor
New York, NY 10007
Phone & Fax: (646) 706-7481
greg@moutonlawnyc.com